IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LINDA KELLER, | ) |
| | ) No. 13 C 6029 |
| Plaintiff, | ) |
| | ) |
| v. | ) Magistrate Judge Michael T. Mason |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## <u>MEMORANDUM OPINION AND ORDER</u>

Claimant Linda Keller ("Keller" or "claimant") brings this action under 42 U.S.C. §
405(g), seeking reversal or remand of the decision by Respondent Carolyn W. Colvin,
Commissioner of Social Security ("Commissioner"). The Commissioner denied Keller's
claim for a period of disability and Social Security Disability Insurance benefits. This
matter is before the Court on cross motions for summary judgment. Claimant seeks
reversal of the Commissioner's decision denying her application for disability insurance
benefits ("DIB"). Alternatively, claimant seeks a remand of the case to the Social
Security Administration (the "SSA"). The Commissioner seeks an order upholding the
decision to deny benefits. For reasons set forth below, claimant's motion for summary
judgment is granted and the Commissioner's motion is denied; the case is remanded to
the Commissioner for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Procedural History

Keller filed an application for a period of disability and DIB on July 6, 2010, alleging a disability onset date of August 27, 2005 due to a pinched nerve, carpal tunnel syndrome of the left hand, depression, right knee problems, and thoughts of self-harm. (R. 21.) At the time she applied for benefits, Keller was fifty years old. Keller's date last insured ("DLI") was December 31, 2006.[1] (*Id.*) The SSA initially denied her application on September 24, 2010 and again on December 8, 2010 after a timely request for consideration. (*Id.*) Therefore, on January 31, 2011, Keller requested a hearing, which was held on December 27, 2011 before Administrative Law Judge Linda Halperin ("ALJ" or "ALJ Halperin"). (*Id.*) Both Keller and her husband, Charles Keller, testified at the hearing. (R. 36-55.)

On May 11, 2012, ALJ Halperin issued a written decision denying Keller's request for benefits. (R. 18-27.) Keller filed a timely request to review the ALJ's decision, and the Appeals Council denied review on June 25, 2013 (R. 1-5.), making the ALJ's decision the final decision of the Commissioner. *See Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001). Keller subsequently filed this action in the District Court on August 26, 2013 pursuant to 42 U.S.C. § 405(g).

---

[1] Because Social Security disability benefits under Title II equal insurance against lost income caused by disability, the applicant/worker must show a recent connection to the work force to maintain insured status. 42 U.S.C. § 423(c) and 20 C.F.R. § 404.130. This generally means the applicant was working in twenty of the last forty quarters. For an applicant who is thirty-one years old or older, the "last date of insured status" is generally five years after her date of last work.

**B. Medical Evidence**

**1. Physical Ailments**

On August 27, 2005, Keller was injured in a motor vehicle collision that resulted in neck pain that radiated through the left upper extremity to the fingers of the left hand, resulting in some weakness. (R. 214.) Keller visited the emergency room and several days later visited Dr. Robert Olson. (*Id.*)

Dr. Olson referred Keller to Dr. Daniel Newman ("Dr. Newman), an orthopedic surgeon, in October of 2005. (R. 212-213.) Upon examination, Dr. Newman confirmed scapulothoracic dysfunction and decreased range of motion in the cervical spine with the production of left-sided neck pain and shoulder pain. (R. 213-14.) After two weeks of treatment and continued pain, Dr. Newman ordered magnetic resonance imaging ("MRI") of the cervical spine and electromyography ("EMG") testing. (R. 212.) The October 28, 2005 MRI revealed "minimal bulging" of the discs at C2-C3, C3-C4, C4-C5, and C5-C6 associated with slight encroachment upon the ventral aspects of the cervical subacromoid space with no direct impingement upon the spinal cord. (R. 218.) The MRI also revealed degenerative changes with osteophytes and relative narrowing of disc space. (*Id.*) However, it revealed no evidence of intervertebral disc herniation. (*Id.*) The November 5, 2005 EMG revealed mild bilateral median nerve neuropathy due to carpal tunnel syndrome. (R. 217.)

Because Dr. Newman believed the MRI and EMG came back normal, except for mild carpal tunnel syndrome, he prescribed an anti-inflammatory agent and physical therapy. (R. 211-12.) Keller visited Dr. Newman several more times between November 2005 and February 2006, undergoing physical therapy, two subacromial

steroid injections, and a second MRI. (R. 208-211.) Although the MRI results were normal except for "small cystic lesions, probably degenerative," Dr. Newman noted in her February 2006 re-evaluation the presence of "some mildly positive impingement signs" and continued pain and "shoulder scapulothoracic dysfunction." (R. 208, 216). Dr. Newman decided that all conservative measures to relieve the shoulder pain had been tried and suggested arthroscopic surgery and acromioplasty. (R. 206.) Dr. Newman successfully performed the surgery on March 15, 2006. (R. 226-27.) Dr. Newman's post-operative examinations showed that Keller's left shoulder pain had disappeared and she had a full range of motion. (R. 203.) However, in a letter dated May 10, 2006, Dr. Newman noted Keller's "basic symptoms of pain extending from the left neck all the way to the hand have not changed significantly." (R. 203.) Dr. Newman also noted in a June 14, 2006 letter that Keller's residual pain in her left upper extremity was related to "nerve root compression" and "an EMG apparently has confirmed this." (R. 202.) He suggested Keller receive a series of epidural injections and consider surgical decompression if epidural injections did not help. (Id.)

In June of 2006, Dr. Newman referred Keller to Dr. Suneela Harsoor ("Dr. Harsoor") for neck pain management. (R. 219.) Dr. Harsoor stated that a physical examination and reviews of Keller's detailed history and MRI were concordant with cervical radiculopathy, cervical discogenic pain, and carpal tunnel syndrome. (R. 220-21.) Dr. Harsoor also noted that Keller was unable to abduct completely and complained of pain in the left wrist area, which worsened with exertion and was partially relieved by ibuprofen. (Id.) Dr. Harsoor documented Keller's report that she was unable to squeeze a tube of toothpaste or grab objects with her left hand. (R. 220.) Dr.

Harsoor also prescribed Lyrica and administered a cervical epidural steroid injection. (R. 225.)

After the steroid injection, Keller had two follow-up visits with Dr. Harsoor on July 21, 2006 and September 8, 2006. (R. 267-68.) Dr. Harsoor wrote that although Keller's pain level was 3-4 out of 10, the "patient does have some functional limitations." (R. 267.) The limitations included being "unable to carry her grandchild" and "drop[ping] things secondary to the pain." (*Id.*) Dr. Harsoor also noted that Keller stopped taking Lyrica because of costs but took ibuprofen for pain. (*Id.*) Dr. Harsoor suggested C-Spine surgery and surgical release of Keller's carpal tunnel syndrome. (R. 268.)

In June of 2006, Keller also visited neurologist Dr. Ralph Cabin ("Dr. Cabin"). (R. 195-96.) After examining Keller, her MRI, and her EMG, Dr. Cabin noted "symptoms of cervical radiculopathy," "tenderness and spasm of the cervical paraspinal muscles, left greater than right," "mild proximal numbness in the left upper extremity," and pain which had "persisted for the last ten months." (R. 195.) Because of Keller's recurrent persistent symptoms despite a full course of physical therapy, Dr. Cabin prescribed a series of cervical epidural nerve blocks. (*Id.*)

Keller again visited Dr. Harsoor on July 20, 2009 for her neck pain. (R. 262-64.) Keller reported that "the pain is made worse by increased activity, walking, lifting laundry, [and] moving arms." (R. 262.) Dr. Harsoor confirmed Keller's previous diagnoses and recommended pain medications, epidural injections, physical therapy, and surgery. (R. 263-64.) Dr. Harsoor also noted that Keller reported she could not afford some pain medication and doctors' visits regarding her carpal tunnel syndrome because she did not have insurance. (R. 263.)

Keller sought medical care at Resurrection Medical Center for lumbosacral neuritis and knee pain in July of 2007. (R. 232-34.) The lumbar spine examination demonstrated "degenerative changes at L5-S1 [with] joint space narrowing with associated sclerosis," and her right knee examination appeared normal. (*Id.*) In April of 2008, she had x-rays taken at Stroger Hospital for a sprained MCL. (R. 239-244). The x-rays showed no fractures, and she was treated with a knee brace and acetaminophen. (*Id.*)

## 2. Mental Ailments

Keller sought a Psychiatric Evaluation at Advocate Illinois Masonic Behavioral Health Services ("Illinois Masonic") on June 22, 2005 due to her feelings of depression over the four previous months and every four years since the age of twenty-four. (R. 259.) She reported significant trouble sleeping, frequent crying, impaired attention, suicidal thoughts, and issues in dealing with prior incidences of sexual abuse and with caring for family members. (R. 260.) She claimed she lost thirty pounds between March and June of 2005. (*Id.*) Keller said she tried various antidepressants but stopped using them because of their side effects. (*Id.*) The examining physician, Dr. Robert Grunsten ("Dr. Grunsten"), diagnosed her with "recurring depression, severe without psychotic features," and assigned her a Global Assessment of Functioning ("GAF") score of 51.[2] (*Id.*) Dr. Grunsten prescribed the antidepressant Wellbutrin and continued psychotherapy and recommended the sexual abuse survivors group. (R. 254, 260.)

---

[2] A GAF score of 51 is at the border of serious symptoms, meaning any "serious limitation in social, occupational, or school functioning," and moderate symptoms, meaning "moderate difficulty in social, occupational, or school functioning." AM. PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32–34 (4th ed. text revision 2000).

Keller underwent another Psychiatric Evaluation in February of 2009 at Illinois Masonic. (R. 256.) Keller reported that, in the previous six months, she experienced poor sleep, irritability, passive suicide ideation, and decreased appetite and energy. (*Id.*) Her diagnosis at this time was "recurring depression, severe without psychotic features," and she was given a GAF score of 58.[3] (R. 257.) She was prescribed Venlafaxine and continued therapy sessions. (*Id.*)

Keller ended treatment at Illinois Masonic in June of 2010. (R. 248.) Her discharge summary noted that Keller attended a total of five individual therapy sessions so her goals for therapy were not entirely addressed or achieved. (*Id.*) Keller's diagnosis remained the same, except for her GAF upon discharge was 52.[4] (*Id.*) The discharge summary recommended that Keller continue to seek therapeutic services in an effort to decrease symptoms of depression. (*Id.*)

In August of 2010, Keller began Cognitive Behavioral Therapy for depression at the University of Illinois at Chicago's Office of Applied Psychological Services. (R. 295-300.) Keller attended seven sessions, cancelled three sessions, and missed one session over two and a half months. (R. 299.) Keller reported that she stopped seeking treatment because of travel and monetary costs. (R. 300.) Keller's termination summary stated that "in almost all sessions, the client's affect was depressed and she usually cried in session" and recommended continued psychotherapy and anti-depressant medication. (*Id.*) Her final diagnosis was "Major Depressive Disorder, Recurrent, Chronic." (*Id.*)

---

[3] A GAF score of 58 represents "moderate difficulty in social, occupational, or school functioning." AM. PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32–34 (4th ed. text revision 2000).
[4] A GAF score of 52 indicates the same functioning as a 58, but lower (more severe) within the range. *Id.*

## C. Agency Consultants

On September 17, 2010, Dr. James Madison ("Dr. Madison") completed a physical residual functional capacity ("RFC") assessment for Keller. (R. 272-279.) According to Dr. Madison, Keller could lift and carry twenty pounds occasionally and ten pounds frequently and could stand, walk, and sit for about six hours in an eight-hour workday. (R. 273.) Dr. Madison also concluded that, due to her shoulder injury and bulging disk, claimant could only occasionally stoop, crouch, or crawl. (R. 274.) Dr. Madison found no other limitations, including no limitations in her ability to push or pull. (R. 273, 275-76.) Dr. Madison based these findings on the 2005 MRI and EMG, the 2006 report from Dr. Cabin, and a 2006 evaluation from Dr. Newman. (R. 273-74.) Dr. Madison also reported that the "allegations and reports appear partially credible in light of the medical evidence. Records show that her limitations exceed that which would be expected by her condition. It did not totally limit her ability to function." (R.277.)

On September 22, 2010, Dr. Tyrone Hollerauer ("Dr. Hollerauer") completed a Psychiatric Review Technique. (R. 280-92.) While it appears that Dr. Hollerauer did consider psychological evaluations from May and June of 2005 and another evaluation from February 2, 2009 as well as Keller's diagnosis of severe and recurrent depressive disorder, Dr. Hollerauer found there to be insufficient medical evidence for a disability determination prior to Keller's DLI. (R. 292.) Dr. Hollerauer did not assess Keller's credibility due to this lack of evidence. (*Id.*)

Following the submission of additional medical evidence, Dr. Lionel Hudspeth, Psy.D, and Dr. Ernst Bone reviewed and affirmed Dr. Madison's and Hollerauer's

opinions. (R. 303.) They noted that no new records from the relevant time period were submitted. (*Id.*)

In her Adult Function Report completed on August 13, 2010, Keller described limitations in lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, concentrating, climbing stairs, completing tasks and using her hands. (R. 140.) She again described her inability to squeeze a tube of toothpaste or open jars and her difficulties in holding objects in her left hand without dropping them due to her carpal tunnel syndrome. (R. 141, 147.) Keller reported that she was taking ibuprofen for pain and wearing an elastic brace prescribed to her in 2006 for her carpal tunnel syndrome. (R. 146-47.)

## D. Claimant's Testimony

Keller appeared at the December 27, 2011 hearing and testified as follows. (R. 36-55.) At the time of the hearing, Keller was fifty-six years old. (R. 36.) She had been married for thirty-seven years, and she has one son and nine grandchildren. (R. 36-38.) She is guardian of her grandson, who has autism and emotional disabilities. (R. 38, 42.) Keller has a ninth grade education, her GED, and her driver's license. (R. 36, 40.)

Prior to 2002, the last time she worked, Keller worked as a receptionist in a photo lab store. (R. 42.) She stopped working there to take care of her grandson. (R. 42, 44.) Prior to 2001, Keller worked as a switchboard operator at a bank, a file clerk at an insurance company, and a cashier at a large chain store. (R. 41.) Her job at the insurance company required lifting heavy boxes of blank checks, walking, and sitting. (*Id.*) She stopped working there in 1999 because she hurt her back lifting a box, and she received workman's compensation after this injury. (R. 41-42.)

Keller testified that, of her many problems -- a pinched nerve, carpal tunnel in her left hand, depression, and her right knee problem -- the depression affects her the most. (R. 45.) She reported currently seeing a psychiatrist and therapist and taking antidepressants three times a day. (R. 45-46.) She described her low self-esteem, her desires to cry and die, and her trouble sleeping. (R. 48-49.) Keller stated that in 2005, she felt "like riding her car into a wall." (R. 48-49.) Her anxiety demonstrated through shortness of breath that lasts up to a couple hours and once led to an anxiety attack. (R. 47.) At the time of the hearing, Keller had not gone anywhere for three or four weeks because she had been sitting in bed crying. (R. 53.) She testified that she has one friend and the support of her sisters and husband. (R. 50.)

Keller testified that her grandson lifts things for her and takes out the garbage, while she does the laundry and goes to the grocery store with her sister. (R. 51-52.) She testified that she cannot lift a twenty pound case of water but can lift an eight pound gallon of milk if she uses two hands. (R. 44.) She also reported trouble sitting and standing for more than an hour. (R. 45.) She reported she had shoulder surgery on November 1, 2011. (R. 44.) The doctors were "so far" pleased with the results. (R. 44-45.)

Charles Keller, Linda Keller's husband, also testified at the hearing. (R. 54.) He said his wife had a hard time lifting things, which, in his view, contributed to her "serious" depression that had been "on-going for many, many years." (R. 54-55.) He said he believed her current treatment was adequate and should continue. (R. 55.)

### E. The ALJ's Opinion

ALJ Halperin issued her decision on May 11, 2012, finding Keller to be not disabled at step four. (R. 26-27.) The decision is discussed in greater detail below, but, briefly, the ALJ found that Keller was capable of performing her past relevant work as a receptionist. (*Id.*) Alternatively, at step five, the ALJ found that Keller was capable of performing other work in the national economy given her age, education, work experience, and RFC. (*Id.*) Keller raises a number of challenges to the decision, and argues that the ALJ committed several errors in finding her not disabled; she seeks summary judgment reversing or remanding the matter to the Commissioner. The Commissioner seeks summary judgment affirming her decision to deny benefits.

## II. LEGAL ANALYSIS

### A. Standard of Review

The Court must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.ED.2d 842 (1971)). In making this substantial evidence determination, while the Court must consider the entire administrative record, its review is deferential. *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). The Court will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (quoting *Clifford v. Apfel*, 227 F.3d

863, 869 (7th Cir. 2000)). Even when the record contains adequate evidence, the decision will not be upheld "if it lacks evidentiary support or an adequate discussion of the issues." *Id.*

Additionally, the ALJ must "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue,* 516 F.3d 539, 544 (7th Cir. 2008). At a minimum, the ALJ must "sufficiently articulate [her] assessment of the evidence to 'assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning.'" *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)). If the Commissioner's decision lacks evidentiary support or an adequate discussion of the issues, it must be remanded. *Campbell v. Astrue,* 627 F.3d 299, 306 (7th Cir. 2010).

## B. Analysis Under the Social Security Act

In order to qualify for DIB, a claimant must be "disabled" under the Social Security Act (the "Act"). A person is disabled under the Act if he or she has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon v. Massanari*, 270 F.3d

1171, 1176 (7th Cir. 2001). The claimant has the burden of establishing a disability at

steps one through four. *Zurawski*, 245 F.3d at 885–86. If the claimant reaches step

five, the burden then shifts to the Commissioner to show that "the claimant is capable of

performing work in the national economy." *Id.* at 886.

ALJ Halperin followed this five-step process. (R. 23-27.) At step one, she

determined that Keller had not engaged in substantial gainful activity during the period

from her alleged disability onset date through her date last insured. (R. 23.) At step

two, ALJ Halperin determined that Keller suffers from the severe impairments of a

"shoulder injury and back pain." (*Id.*) ALJ Halperin also determined that Keller's

impairments of depression and anxiety were non-severe because they did not cause

more than minimal limitations in Keller's ability to perform basic mental work activities.

(*Id.*) As support for this determination, ALJ Halperin indicated that she considered the

"paragraph B" criteria used to rate the severity of mental impairments at steps 2 and 3

of the sequential evaluation process and found that "the claimant's medically

determinable mental impairments caused no more than "mild" limitation in any of the

first three functional areas and "no" episodes of decompensation which have been of

extended duration in the fourth area." (R. 24.) *See* 20 CFR, Pt. 404, Subpt. P, App. 1,

§§ 12.01-12.04, 12.06-12.08. ALJ Halperin pointed to the residual functional capacity

assessment as evidence of her "paragraph B" determination. (*Id.*) In doing so, ALJ

Halperin stated, "the following residual function capacity assessment reflects the degree

of limitation the undersigned has found in the 'paragraph B' mental function analysis."

(*Id.*)

Next, at step three, ALJ Halperin found that Keller does not have an impairment or combination of impairments that meets or medically equals the severity of the one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (*Id.*) In particular, ALJ Halperin noted that the record does not document neurological abnormalities such as motor loss, sensory loss, or muscle weakness necessary to meet the requirements of section 1.04 of the Listing. (*Id.*)

ALJ Halperin went on to assess Keller's RFC. (R. 24- 26.) "After careful consideration of the entire record," ALJ Halperin determined that Keller had the ability to perform light work as defined in 20 CFR § 404.1567(b), except that she could not "stoop, crouch or crawl more than occasionally." (R. 24.) The ALJ noted that she considered "all the symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as opinion evidence. (*Id.*) As support, ALJ Halperin cited Keller's MRI from October 28, 2005, Keller's EMG from November 5, 2005, a follow-up report from July 20, 2009 (presumably Dr. Cabin's report), a psychological treatment report from October 13, 2010, a final psychological services session report rendered on November 18, 2010, the claimant's testimony, and the claimant's appearance and demeanor during testimony. (R. 25-26.) ALJ Halperin then evaluated Keller's credibility, finding that "the claimant has not generally received the type of medical treatment one would expect for a totally disabled individual" and that "the disparity between claimant's subjective representations and the medical evaluations create[s] credibility issues regarding the claimant's allegations." (R. 26.)

14

Next, ALJ Halperin found that the claimant was capable of performing her past relevant work as a receptionist because "this work did not require the performance of work-related activities precluded by the claimant's RFC." (*Id.*) ALJ Halperin continued to step 5 in the alternative, finding that, even if she could not perform her past work, she could perform other work in the national economy, given her age, education, work experience, and RFC. (*Id.*) ALJ Halperin stated that "the additional limitations had little or no effect on the occupational base of unskilled light work" under Medical-Vocational Rule 202.13. (R. 27.) As a result, the ALJ found that Keller was not under a disability from August 27, 2005 through the date last insured. (*Id.*)

Keller argues that the ALJ erred (1) in assessing the severity of her mental impairments, (2) in failing to address functional limitations in her RFC, (3) in determining Keller was capable of performing her past work as a receptionist, and (4) in evaluating her credibility.

## A. The ALJ Did Not Properly Evaluate the Claimant's Credibility.

This Court begins with Keller's claim that the ALJ improperly found credibility issues between Keller's subjective representations and the medical evidence throughout the five-step inquiry. (R. 26.) Specifically, Keller alleges that ALJ Halperin improperly assessed her credibility by basing her findings on Keller's history of infrequent treatment, her demeanor at the hearing, and on meaningless boilerplate language.

Generally, the ALJ is in a superior position to judge the credibility of a claimant, and the ALJ's credibility determination is entitled to deference. *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008) (citing *Sims v. Barnhart,* 357 F.3d 697, 703 (7th Cir. 2006)).

The Court "defer[s] to an ALJ's credibility determination and shall overturn it only if it is patently wrong. It therefore should rarely disturb an ALJ's credibility determination, unless that finding is unreasonable or unsupported." *Getch v. Astrue.* 539 F.3d 473, 483 (7th Cir. 2009) (internal citations omitted). Still, the ALJ must "sufficiently articulate [her] assessment of the evidence to assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning." *Carlson,* 999 F.2d at 181 (per curiam) (internal citation omitted).

In assessing the claimant's credibility, the ALJ must (once she determines that a claimant's impairments could reasonably be expected to produce the claimant's symptoms) evaluate "the intensity, persistence, or functionally limiting effects" of those symptoms. SSR 96-7p, 1996 WL 374186, at *2. When the claimant's statements about such effects are not substantiated by objective medical evidence, the ALJ must make a credibility determination based on the entire case record. *Id.* In making a credibility determination, the ALJ should consider the following factors in addition to objective medical evidence: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of medication the claimant takes to alleviate pain; (5) treatment, other than medication, that the individual has received for relief of pain; (6) any other measures the individual uses to relieve pain; and (7) any other factors concerning the individual's functional limitations. *Id.* at *3.

ALJ Halperin stated that Keller's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 25.) However,

16

in making this determination, ALJ Halperin failed to properly support her reasoning or to cite substantial medical evidence within the relevant time period (that is, August 27, 2005 to December 31, 2006). As discussed below, the ALJ's conclusory discussion of Keller's credibility and use of meaningless boilerplate language fails to address timely evidence regarding Keller's symptoms or to explain why that evidence was rejected. Upon remand, the ALJ may again decide that Keller is not entitled to disability benefits. However, without an analysis that is thorough and consistent with SSA regulations, this Court cannot affirm the ALJ's decision.

When assessing the credibility of Keller's stated shoulder and carpel tunnel limitations, ALJ Halperin cited only two pieces of objective medical evidence - a 2005 MRI and a 2005 EMG - from the relevant time period. (R. 25.) She failed to address substantial medical evidence from 2005 and 2006 on Keller's various treatments, including prescription and over-the-counter pain medications, two subacromial steroid injections, physical therapy, several doctors' visits, and shoulder surgery in March of 2006. (R. 206-226.) Furthermore, she does not explain why she disregards Dr. Harsoor's report that "the patient does have some functional limitations" inhibiting her ability to carry and lift. (R. 267.) ALJ Halperin's failure to address why she rejects this medical evidence from the relevant time period warrants remand. *See Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (stating, "Although the ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling. Otherwise it is impossible for the reviewing court to tell whether the ALJ's decision rests upon substantial evidence" (internal citations omitted)).

17

With regard to Keller's alleged limitations due to depression and anxiety, ALJ Halperin cited two psychological reports from 2010 – four to five years after the time in question. (R. 25.) ALJ Halperin failed to explain why she ignored the more timely psychological report in the record from May of 2005. (R. 254.) In the 2005 evaluation, Dr. Grunsten diagnosed Keller with recurrent and severe major depression, prescribed antidepressants, discussed Keller's previous prescriptions, and assigned Keller a GAF score of 51. *Id. See also Campbell*, 627 F.3d at 306-07 (stating "A GAF rating of 50 does not represent functioning within normal limits.") The Commissioner is correct that medical evidence or treatment a claimant receives after her date last insured can be relevant to assessing her condition during the disability period. *See Halvorsen v. Heckler,* 743 F.2d 1221, 1225 (7th Cir. 1984) ("There can be no doubt that medical evidence from a time subsequent to a certain period is relevant to a determination of a claimant's condition during that period."). However, because the ALJ chose to cite medical evidence on Keller's mental limitations from four years after the relevant time period, the ALJ also had a duty to discuss contrary medical evidence from only three months before the relevant time period. *See Clifford*, 227 F.3d, 703 (7th Cir. 2004) (citation omitted).

Second, ALJ Halperin's failure to properly consider the issue of (in)frequency of treatment warrants remand. *Pursell v. Colvin*, 12 CV 5455, 2013 WL 3354464 (N.D. Ill. July 3, 2013). ALJ Halperin concluded that Keller "has not generally received the type of medical treatment one would expect for a totally disabled individual." (R. 26.) However, in relying on that lack of treatment history as support for her conclusions, the ALJ failed to comply with SSR 96–7p, which states, in relevant part:

> [T]he adjudicator must not draw any inferences about
> an individual's symptoms and their functional effects from a
> failure to seek or pursue regular medical treatment without
> first considering any explanations that the individual may
> provide, or other information in the case record, that may
> explain infrequent or irregular medical visits or failure to seek
> medical treatment.

SSR 96–7p, 1996 WL 374186, at *7; *accord Ellis v. Barnhart,* 384 F.Supp.2d 1195, 1203 (N.D.Ill. 2005) ("[T]he ALJ could rely on [claimant's] non-compliance as long as he had first considered [claimant's] explanations for her non-compliance.").

Here, ALJ Halperin failed to investigate – or even ask – why Keller received such sporadic treatment. ALJ Halperin did not question Keller on this point at the hearing or address record evidence that might explain Keller's lack of medical and psychiatric treatment, consistent or otherwise. Without addressing the reasons for Keller's lack of treatment history or suggesting what treatment would have been proper, the ALJ "was not entitled to infer that [Keller's] failure to follow through … shows that [Keller's] pain was less serious than [she] described." *Newell v. Astrue,* 869 F.Supp.2d 875, 888 (N.D.Ill. 2012). *See also Craft,* 539 F.3d at 679.

Third, ALJ Halperin's reliance on boilerplate language without further examination of the specific factors affecting the claimant's credibility is grounds for remand. *Bjornson v. Astrue,* 671 F.3d 640, 649 (7th Cir. 2012). In her decision, ALJ Halperin wrote that Keller's statements concerning the effects of her symptoms "are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 25.) However, the Seventh Circuit has suggested that when an ALJ first determines the claimant's RFC and then determines that claimant's credibility, "that

gets things backwards." *Bjornson,* 671 F.3d at 645. An ALJ must first determine the claimant's credibility, and then determine her RFC, not the other way around. *Id.*

Last, ALJ Halperin failed to build a logical bridge between Keller's demeanor in 2010 and how it informed her conclusion regarding Keller's credibility in describing her limitations in 2005 and 2006. ALJ Halperin stated that the medical evidence and "generally unpersuasive appearance and demeanor" conflicted with her subjective claims that "her back, neck, or hand difficulties are so severe that she would not retain the ability to perform a variety of work activities within the light exertional level." (R. 26.) ALJ Halperin did not explain what specifically about Keller's demeanor was unpersuasive regarding mental and physical limitations allegedly existing between four and five years earlier. This failure is compounded by the fact that she posed no questions to Keller directly concerning the symptoms or limitations she experienced during the relevant time period in the hearing. On her own, Keller testified that, in 2005, she "felt like [she] wanted to drive [her] car into a wall" (R. 48-49), and Keller's husband testified that Keller's "serious" depression had been on-going for many years. (R. 54-55.) Still, the ALJ did not explain specifically why she discounted that testimony or why psychological reports of suicide ideation, psychotherapy, and antidepressant prescriptions did not substantiate them. (R. 259.) Therefore, the Court cannot find a logical bridge between Keller's demeanor and testimony in 2010 and how it informed the ALJ's conclusion regarding the credibility of Keller's stated limitations in 2005 and 2006.

For all of these reasons, ALJ Halperin's inadequate articulation and disregard of substantial medical evidence from the relevant time period in her credibility assessment

warrant remand.  We do not opine on whether Keller's testimony was credible, only that the ALJ's finding lacked sufficient detail as to why she discounted Keller's testimony and other timely information in the record about Keller's alleged limitations.  On remand, the ALJ shall explain how the record, treatment, medications, daily activities, and other factors provided for in SSR 96–7p support the credibility finding.  The ALJ shall also clarify why certain medical evidence is rejected and what specific aspects of Keller's statements and demeanor, if any, are found to be non-credible.

## B. The RFC Assessment is Deficient.

Keller next argues that ALJ Halperin improperly substituted her RFC analysis for the paragraph B analysis in step two when determining that Keller's depression and anxiety were not severe.  She also alleges that ALJ Halperin's RFC analysis fails to address functional limitations produced by her depression and by her carpal tunnel syndrome.

A claimant's RFC is the most a claimant can still do despite her limitations.  20 C.F.R. § 404.1545(a)(1).  Mental limitations must be part of the RFC assessment, because "[a] limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting, may reduce [a claimant's] ability to do past work and other work."  *Id.* § 404.1545(c).  *See also Craft*, 539 F.3d at 676.  Additionally, the RFC must be based on medical evidence in the record and other evidence, such as testimony by the claimant or her family.  20 C.F.R. § 404.1545(a)(3).

In making the RFC determination, the ALJ must decide which treating and examining doctors' opinions should receive weight and explain the reasons for that finding. 20 C.F.R. § 404.1527(d), (f). The RFC assessment must contain a narrative discussion describing how the evidence supports the ALJ's conclusions and explaining why any medical source opinion was not adopted if the ALJ's RFC assessment conflicts with such an opinion. SSR 96-8p, 1996 WL 374184, at **5, 7; *accord Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

A court will uphold an ALJ's decision "if the evidence supports the decision and the ALJ explains [her] analysis of the evidence with enough detail and clarity to permit meaningful review." *Arnett v. Astrue*, 676 F.3d 586, 591-92 (7th Cir. 2012) (citing *Eichstadt v. Astrue*, 534 F.3d 663, 665-66 (7th Cir. 2008)). "Although an ALJ need not mention every snippet of evidence in the record, the ALJ must connect the evidence to the conclusion; in so doing, [she] may not ignore entire lines of contrary evidence." *Id.* at 592 (internal citations omitted). Additionally, an ALJ "may not draw conclusions based on an undeveloped record and 'has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernible.'" *Richards v. Astrue,* 370 Fed.Appx. 727, 731 (7th Cir. 2010) (internal citations omitted).

First, we find no reversible error in the ALJ's choice to point to her RFC analysis as support for her conclusions under the paragraph B analysis of the special technique for evaluating the severity of mental impairments. Under the special technique, the ALJ evaluates the claimant's pertinent symptoms, signs, and laboratory findings to determine whether the claimant has a medically determinable mental impairment. *Lopez v. Colvin*, No. 12 C 7025, 2014 WL 117477, at *7 (N.D.Ill. Jan. 10, 2014).

However, step two of the ALJ's analysis is "merely a threshold requirement." *Castile v. Astrue,* 617 F.3d 923, 927 (7th Cir. 2010) (*quoting Hickman v. Apfel,* 187 F.3d 683, 688 (7th Cir. 1999)). "As long as the ALJ determines that the claimant has one severe impairment, the ALJ will proceed to the remaining steps of the evaluation process." *Castile,* 617 F.3d at 926–27. In these remaining steps, ALJ Halperin was "obligated to consider the combined effect of all of [the] claimant's impairments, both severe and non-severe." *Amey v. Astrue*, No. 09 C 2712, 2012 WL 366522, at *6 (N.D.Ill. Feb. 2, 2012) (*citing Golembiewski*, 322 F.3d at 918). Thus, because ALJ Halperin proceeded with the full evaluation process, the substitution of her RFC analysis for her paragraph B analysis is of no consequence. *See Willis v. Astrue,* 10–207–CJP, 2011 WL 2607042, at *9 (S.D.Ill. July 1, 2011) (stating "the determination of whether a particular impairment is severe or not is of no consequence to the outcome of the case where ... the ALJ recognized other severe impairments and so proceeded with the full evaluation process."). *See also Pepper v. Colvin*, 712 F.3d. 351, 366-67 (7th Cir. 2013) (explaining how, under some circumstances, the failure to explicitly apply the special technique may be harmless error).

However, the ALJ's substitution of the RFC analysis for the paragraph B analysis underscores the importance of an overall RFC evaluation that is proper and supported by "pertinent findings and conclusions" under 20 C.F.R. § 404.1520a(e)(4); *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008). As discussed below, upon remand, the Commissioner is directed to make appropriate RFC findings based on a more thorough analysis of the medical evidence.

As in her credibility determination, ALJ Halperin failed to consider medical evidence from the relevant time period when determining Keller's mental RFC. In finding that Keller's depression and anxiety did not inhibit her ability to perform light work as defined in 20 CFR § 404.1567(b), ALJ Halperin failed to explain why she cited two psychological treatment reports well after the time in question, while she rejected the more timely 2005 psychological evaluation from Illinois Masonic. (R. 254.) ALJ Halperin mentioned her "careful consideration of the entire record" in determining Keller's mental impairments produced no more than mild limitations. (R. 24.) Despite her consideration of the entire record, the ALJ had a duty to, at a minimum, specifically address the 2005 report because it was closer in time to her onset date and because it explained limitations due to impaired attention, suicide ideation, and fatigue. (R. 260.) *See Craft*, 539 F.3d at 678 (explaining that the ALJ is entitled to give medical opinions whatever weight is due, but "the failure to mention [a] detailed mental assessment is cause for concern."). *See also Goble v. Astrue,* 385 Fed.Appx. 588, 593 (7th Cir. 2010) ("An ALJ is obligated to consider all relevant medical evidence and may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.").

Second, the ALJ failed to consider important evidence when determining Keller's physical RFC. As noted above, the ALJ concluded that Keller had the RFC to perform light work as defined in 20 CFR § 404.1567(b) except that she could not "stoop, crouch or crawl more than occasionally." (R. 24.) The ALJ did not find that Keller had any limitations with regards to lifting, pushing, or pulling, or any other actions involving her left shoulder or left hand. However, substantial medical evidence exists in the record

that points to restrictions in Keller's ability to lift, push, or pull due to her shoulder pain, shoulder surgery, neck pain, and carpal tunnel syndrome after her car accident on August 27, 2005 – the date of her alleged disability onset.

The records show that, after several evaluations and physical therapy sessions, Dr. Newman found two steroid injections and surgery to be necessary due to Keller's constant left shoulder pain. (R. 203-208.) In her decision, ALJ Halperin made no mention of these procedures. Additionally, Dr. Harsoor documented Keller's "functional limitations," including her inability to squeeze a tube of toothpaste, grab things with her left hand, and carry her grandchildren. (R. 220, 267.) ALJ Halperin also made no mention of these limitations; nor did she discuss the testimony from Ms. Keller and her husband about her difficulties with lifting. (R. 44, 54.) ALJ Halperin failed to build a logical bridge between the medical evidence documenting Keller's hand, neck, and shoulder pain and her conclusion that Keller possessed no upper body or upper extremity limitations. *Hill v. Astrue*, 295 F. App'x 77, 82 (7th Cir. 2008). Again, this does not mean that, at the end of the day, Keller will be found to be disabled. Still, the RFC determination must be supported and explained. On remand, the Commissioner is directed to include sufficient detail in support of the RFC determination.

**5. The ALJ's Step Four and Five Analyses Were Insufficient.**

Finally, Keller argues that ALJ Halperin improperly determined she was capable of performing her past relevant work as a receptionist or other work in the national economy. "The decision as to whether the claimant retains the functional capacity to perform past work which has current relevance has far-reaching implications and must be developed and explained fully in the disability decision." SSR 82-62, 1982 WL

31386, at *3. Because remand is required for ALJ Halperin's improper credibility analysis, the Court suggests that the ALJ inquire into the demands of Keller's past relevant work and explain how, given her limitations, Keller is capable of performing those tasks. *Ruiz v. Barnhart*, 518 F. Supp. 2d 1007 (N.D. Ill. 2006). Alternatively, if the ALJ finds Keller to be credible, the ALJ must specifically outline what medical evidence supports Keller's significant limitations in her ability to perform those tasks or the tasks required in other positions in the national economy.

## CONCLUSION

Upon remand, the ALJ may or may not decide that Keller is entitled to disability benefits for the relevant period between her disability onset date and her date last insured. However, without an analysis that is thorough and consistent with Social Security Regulations, this Court cannot affirm this decision. Therefore, and for the reasons set forth above, the Court grants Keller's motion for summary judgment [16] and denies the Commissioner's motion for summary judgment [20]. The case is remanded for further proceedings consistent with this opinion.


Date: November 21, 2014

ENTERED:

_____

MAGISTRATE JUDGE MICHAEL T. MASON
UNITED STATES DISTRICT COURT